# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MINIATURE PRECISION COMPONENTS, INC.,

  Plaintiff,

v.                                    Case No. 18-CV-1838

STANDEX ELECTRONICS, INC.,

  Defendant.

# DECISION AND ORDER

## 1. Background

Plaintiff Miniature Precision Components, Inc. (MPC), supplied Ford Motor Company with oil separator assemblies for use in Ford's model year 2014, 2015, and 2016 Super Duty Trucks. (ECF No. 152-1, ¶¶ 1, 3.) In constructing the oil separator assemblies MPC used a sensor it purchased from defendant Standex Electronics, Inc., (ECF No. 152-1, ¶ 2.) The sensor was designed to trigger a diagnostic trouble code, resulting in the illumination of the vehicle's "Check Engine" light, if a hose became disconnected from the oil separator assembly. (ECF Nos. 152-1, ¶¶ 7, 29; 164-1, ¶¶ 4-5.)

In July of 2015 Ford informed Standex and MPC that it had seen an increase in warranty claims related to the oil separator assemblies. (ECF No. 164-1, ¶¶ 23, 65.) MPC

concluded that Standex's sensors were failing, resulting in illumination of the Check Engine light even though the hose remained properly connected. (ECF No. 164-1, ¶ 58.) As a result, drivers were bringing their vehicles in for service unnecessarily. (ECF No. 164-1, ¶ 58.) MPC negotiated a settlement with Ford in 2016 under which MPC agreed to be responsible for a percentage of the warranty costs. (ECF No. 164-1, ¶ 61.) MPC ultimately paid Ford $7.4 million. (ECF No. 164-1, ¶ 62.) In this lawsuit MPC seeks that sum from Standex. (ECF No. 164-1, ¶ 63.)

MPC and Standex have both moved for summary judgment. MPC seeks partial summary judgment on liability. (ECF No. 131.) Standex seeks summary judgment on the ground that MPC allegedly failed to provide timely notice to Standex of the alleged defect. (ECF No. 145.) Alternatively, Standex seeks partial summary judgment dismissing MPC's claims for breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, contractual indemnification, and common law indemnification, as well as limiting MPC's damages to only those sensors that MPC retained and can prove did not conform to the specifications. (ECF No. 145.)

MPC also seeks to exclude at least portions of the proposed testimony of Standex's experts, John G. Peters (ECF No. 121) and Michael Nranian (ECF No. 129). Standex seeks to bar Pradeep Lall (ECF No. 133) and Patrick O'Keefe (ECF No. 138) from testifying as experts for MPC. Standex also seeks to exclude a spreadsheet of warranty claims prepared by Ford (ECF No. 135) and sanctions for alleged spoliation (ECF No. 143).

The court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and MPC is a citizen of Wisconsin and Standex is a citizen of Ohio. (ECF No. 1, ¶¶ 3-4.) All parties have consented to the full jurisdiction of this court under 28 U.S.C. § 636(c). (ECF Nos. 8, 9.)

## 2. Motions for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

### 2.1. The Agreement

The parties agree that they had a contract for Standex to sell and for MPC to buy the sensors. (ECF No. 152-1, ¶ 11.) However, they have different views as to the terms of

that agreement. Each side argues that its terms and conditions apply. MPC contends that, under its terms and conditions, Standex was obligated to provide an expansive warranty, indemnify MPC for any claims, and was broadly liable for damages. Standex insists that its terms and conditions control, and it provided only a limited warranty, disclaimed any further liability, and is entitled to indemnification from MPC.

Notwithstanding MPC's disagreement with the characterization (ECF Nos. 163-1 at 7, 16; 168-1 at 2), this case presents a classic battle of the forms. *See Northrop Corp. v. Litronic Indus.*, 29 F.3d 1173, 1174 (7th Cir. 1994) ("'Battle of the forms' refers to the not uncommon situation in which one business firm makes an offer in the form of a preprinted form contract and the offeree responds with its own form contract."). Under the traditional "mirror image" rule, any variance in the terms of an acceptance from the terms in the offer cause the acceptance to act as a counteroffer. *See id.*; *Curwood Inc. v. Prodo-Pak Corp.*, No. 07-C-544, 2008 U.S. Dist. LEXIS 18295, at *6 (E.D. Wis. Mar. 7, 2008). Thus, "[i]f parties to an agreement had already performed after exchanging forms with conflicting terms, 'the terms of the party who sent the form…would become the terms of the parties's contract,' as the 'last shot' in the battle of forms." *Id.* (quoting *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 99 (3d Cir. 1991)).

Section 2-207 of the Uniform Commercial Code, codified in Wisconsin at Wis. Stat. § 402.207, largely abrogated the mirror image rule in recognition of the fact that "[s]ales contracts often do not involve an express agreement on all terms. Instead, one party sends

its form to the other party, and the other responds with its own form, which may include significantly different terms." *Stoughton Trailers, LLC v. ArcelorMittal Dofasco, Inc.*, No. 07-cv-374-bbc, 2008 U.S. Dist. LEXIS 28914, at *13 (W.D. Wis. Apr. 8, 2008). U.C.C. § 2-207 reflects the "marketplace reality" "that buyers and sellers rarely read the fine print in purchase orders or acceptances but rely only on the filled-in portions that specify critical terms such as quantity, quality and price." *Stoughton Trailers,* 2008 U.S. Dist. LEXIS 28914, at *13 (citing James J. White & Robert S. Summers, *Uniform Commercial Code* § 1-3, at 6-7 (4th ed. 1995)).

Section 2-207, as codified in Wisconsin, states:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree,

together with any supplementary terms incorporated under any other provisions of chs. 401 to 411.

Wis. Stat. § 402.207.

When attempting to determine the terms of the parties' agreement, the first step under § 2-207 is to identify the relevant forms and the appended terms and conditions that the parties exchanged. MPC argues that the terms of the contract are the Terms and Conditions of Purchase that were incorporated into its purchase orders. (ECF No. 152-1, ¶ 12.) Standex's position is that "[t]he parties' contract for the Sensors consists of Standex's Quotations, which included its Terms of Sale, and the MPC Purchase Orders accepting Standex's Quotations." (ECF No. 164-1, ¶ 27.) Unfortunately, the parties' submissions do not appear to completely set forth the forms (and conditions) the parties exchanged.

A quotation is generally not an offer. *Q.C. Onics Ventures, LP v. Johnson Controls, Inc.*, No. 1-04-CV-138-TS, 2006 U.S. Dist. LEXIS 45189, at *14 (N.D. Ind. June 21, 2006) (citing cases); *see also All. Laundry Sys. LLC v. Stroh Die Casting Co.*, 2008 WI App 180, ¶ 33, 315 Wis. 2d 143, 159-60, 763 N.W.2d 167, 175 ("Courts often consider a quotation a preliminary step in negotiations because it does not have the level of detail and completeness of a typical offer.") (citing cases). And Standex has not proven that its quotation had the detail and completeness of a typical offer. But even if the quotation was an offer, MPC's purchase orders did not accept the terms and conditions incorporated

6

into Standex's quotation. It is undisputed that MPC's purchase orders for the sensors at issue[1] included the following:

> This purchase order is a requirements contract, and is expressly limited to the provisions stated herein, and MPC's Terms and Conditions of Purchase (available at http://www.mpc-inc.com, "the T&C"). MPC rejects any additional or different terms proposed by the seller, which are not binding on MPC unless MPC expressly agrees to them in writing.

(ECF No. 141-26.)

If MPC's purchase orders were offers, then Standex accepted those offers when it shipped product, accompanied by its invoices. This arrangement, with the purchase order as the offer and the invoice as the acceptance, is a fairly ordinary commercial arrangement. *See, e.g.*, *Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1337 (7th Cir. 1991).

The parties agree that Standex's invoices included Standex's terms and conditions. (ECF No. 164-1, ¶ 31.) Standex's proposed findings of fact quote its terms and conditions as stating:

> NATURE OF THE DOCUMENT. This document is an offer by Standex Electronics Inc. or, as applicable, ATC-Frost Magnetics, Inc. both wholly owned subsidiaries of Standex International Corporation (collectively "Seller") directed to the party to whom the quotation is furnished ("Buyer") to sell the products specified on the face of this quotation (the "Products") on the terms and conditions contained herein. This offer supersedes any oral quotation which may have been furnished by Seller to Buyer with respect to the Products. Any definite and reasonable expression of acceptance (including a purchase order) from Buyer which is received by Seller before the expiration of this quotation (as specified in Section 3) shall

---

[1] MPC issued at least two other purchase orders for sensors not at issue. (ECF Nos. 147-78; 147-86.)

constitute agreement to, and a contract consisting of, the terms and conditions hereof and of any invoice issued by Seller. Any different or additional terms in Buyer's expression of acceptance of this offer is hereby expressly rejected and objected to. This negotiation is subject to amendment, without penalty or liability, for correction of errors appearing on the face hereon.

(ECF No. 164-1, ¶ 32.) But that language is from Standex's "Electronics Terms of Sale" and clearly applies only to a quotation. (ECF No. 147-83 at 6.) The document would make no sense if attached to an invoice. Yet the parties tell the court that it *was* attached to all of the invoices. (ECF No. 164-1, ¶ 31.)

Toward that end, the court looked to Standex's invoices submitted by MPC. (ECF No. 141-29.) MPC points to the invoices as proof of Standex's performance. (ECF No. 151-1, ¶ 18.) The invoices submitted by MPC are as follows: December 31, 2013, for 2,880 units; June 30, 2014, for 4,500 units; July 8, 2014, for 2,160; November 12, 2015, for 180 units; December 5, 2016, for 180 units; January 13, 2017, for 1,080 units; and July 31, 2019, for 180 units. (ECF No. 141-29.) Two significant details jump out from these invoices. First, they reflect the purchase of fewer than 12,000 sensors—a small fraction of the total number of sensors at issue, pretty clearly showing that the court has not been provided with all of the invoices. Second, with respect to last three invoices a "Terms of Sale" page follows the invoice. (ECF No. 141-29 at 6, 8, 10.) The court assumes that the Terms of Sale were attached to, or on the back of, the invoices immediately preceding each page listing the Terms of Sale, although the parties do not say that this is the case. Moreover, because no Terms of Sale immediately follow the first four invoices submitted, it is unclear if those

8

invoices (let alone any invoices that have not been provided to the court) included *any* "Terms of Sale."

Importantly, the Terms of Sale that were provided to the court along with Standex's invoices are materially different from the terms included with Standex's quotation and state:

> NATURE OF DOCUMENT. This document is the acceptance of Standex Electronics Inc. … (collectively "Seller") to sell the Products specified on the face of this Invoice on the Terms and Conditions herein. *Acceptance by Seller of Buyer's Purchase Order(s) is expressly conditioned on Buyer's assent to these Terms and Conditions.* Seller's acceptance of a Purchase Order from Buyer shall not constitute acceptance of any terms and conditions which differ from the Terms and Conditions herein, except as Seller may otherwise specify in writing. This Invoice supersedes any oral quotation which may have been furnished by Seller to Buyer.

(ECF No. 141-29 at 6 (omitted language reflects immaterial variances between forms regarding subsidiaries; emphasis added).) The italicized sentence is significant under § 2-207. If each invoice sent by Standex to MPC included Terms of Sale with this language, it would mean that each invoice did *not* accept the terms in MPC's purchase order but rather was a counteroffer, in which case no contract would be formed by the parties' writings. U.C.C. § 2-207(1). But because MPC and Standex nonetheless proceeded as if a contract existed, the parties' agreement would consist of the terms on which they agreed, while additional or different terms would drop out, to be supplanted by gap-fillers under U.C.C. § 2-207(3).

Thus, notwithstanding the parties' apparent agreement that the terms and conditions attached to Standex's quotations were also attached to its invoices, the documents they submit seem to belie that point. It appears that the invoices had different terms and conditions, titled "Terms of Sale"—or at least some of them did. However, the parties have not established that the Terms of Sale that were included in the exhibit submitted by MPC actually were provided with every invoice that Standex provided for the sensors at issue. Thus, the court cannot conclude that U.C.C. § 2-207(3) applies.

While the parties agree that terms and conditions were provided with every Standex invoice (ECF No. 164-1, ¶ 31), their proposed findings of fact indicate that those terms (ECF No. 164-1, ¶ 32) were materially different from those which were included in Exhibit R to the declaration of Michael D. Huitink (ECF No. 141-29). Because a factual question exists as to which terms and conditions were appended to which forms, the court finds it cannot, for purposes of the parties' motions, determine the terms of the parties' agreement.

### 2.2. MPC's Motion for Summary Judgment (ECF No. 131)

MPC's argument in support of its motion for summary judgment rests entirely on the premise that its Terms and Conditions of Purchase govern the parties' relationship. (ECF No. 132-1 at 19-21.) Because MPC has not proven that its Terms and Conditions of Purchase control, MPC's motion for summary judgment must be denied.

### 2.3. Standex's Motion for Summary Judgment (ECF No. 145)

Likewise, without being able to determine whether MPC's terms, Standex's terms (whatever they are), or standard U.C.C. terms control the material aspects of this dispute, the court must largely deny Standex's motion for summary judgment. There are, however, two aspects of Standex's motion that the court can resolve without determining the terms of the parties' contract.

#### 2.3.1. Common Law Indemnification

As noted, it is undisputed that a contract existed, regardless of whether the contract is governed by one party's terms or by the U.C.C. (ECF No. 146-1 at 28.) Given the undisputed existence of a contract (even if merely by operation of U.C.C. § 2-207(3)), Standex argues that MPC cannot assert an equitable claim for indemnification. (ECF No. 146-1 at 28.) In the absence of a valid tort claim, there can be no equitable claim for indemnification. (ECF No. 146-1 at 28-29.) And, in any event, a tort claim would be barred by the economic loss doctrine. (ECF No. 146-1 at 29, fn. 3.)

MPC responds, "MPC acknowledges that if the Court finds its Terms control, its claim for common law indemnification should be dismissed. However, until this Court makes such a ruling the Federal Rules and case law permit MPC to plead in the alternative." (ECF No. 163-1 at 20.)

MPC's response does not address Standex's argument. Standex does not dispute that alternative pleading is appropriate. Standex's argument is that, regardless of whether

MPC's terms apply (or Standex's terms, or standard U.C.C. terms), MPC's common law indemnification claim fails.

"Failure to respond to an argument … results in waiver." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *see also Burton v. Bd. of Regents*, 851 F.3d 690, 695 (7th Cir. 2017) ("[i]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered" (quoting *Liberles v. Cook Cty.*, 709 F.2d 1122, 1126 (7th Cir. 1983))); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011); *Arlin-Golf, LLC v. Vill. of Arlington Heights*, 631 F.3d 818, 822 (7th Cir. 2011); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010). Moreover, Standex has demonstrated that it is entitled to summary judgment on this issue. Accordingly, the court will grant Standex's motion with respect to MPC's common law indemnification claim. Count Six of the complaint (ECF No. 1-1, ¶¶ 59-62) will be dismissed.

### 2.3.2. Limitation on Damages

MPC's claim against Standex is for the $7.4 million it paid to Ford in settlement of warranty claims for more than 125,000 alleged sensor failures. (ECF No. 146-1 at 29.) Standex disputes that this many sensors did not meet specifications. It notes that, of the more than 125,000 allegedly faulty sensors, MPC tested only 164. (ECF No. 146-1 at 29.) Of the 164 tested, only 64 triggered a diagnostic trouble code. Standex argues that MPC should have required Ford to retain all of the oil separator assemblies. And to those

sensors and assemblies that MPC obtained from Ford, MPC improperly disposed of many. Consequently, Standex argues that MPC's claim for damages is limited to those sensors that it retained and can prove did not meet the specifications. (ECF No. 146-1 at 29.)

MPC states in a heading of its brief, "No Limitation Should Be Placed on MPC's Recovery" (ECF No. 163-1 at 19), but it does not expand on this assertion. As noted, a non-movant's silence in response to a motion generally results in the court granting the motion. The absence of a response from MPC to this aspect of Standex's summary judgment motion is all the more surprising given that its responses to other motions filed by Standex clearly demonstrate that it strongly opposes the basis for Standex's summary judgment motion. *(See, e.g.*, ECF Nos. 160-1 (MPC's response to Standex's motion for sanctions for spoliation); 158 (MPC's response to Standex's motion to exclude Ford's warranty claim spreadsheets).) But it is not the court's role to cobble together arguments from a party's disparate filings. Instead, the court would ordinarily grant this aspect of Standex's motion for summary judgment and dismiss as moot the related motions.

However, it remains the movant's burden to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Standex has failed to carry that burden, and the court finds itself obligated to deny Standex's motion despite MPC's failure to respond.

This aspect of Standex's summary judgment motion (*see* ECF No. 146-1 at 30-32) is largely a reiteration of its spoliation motion (ECF No. 143), which the court addresses below. For the same reason that Standex's spoliation motion fails, Standex is not entitled to summary judgment because of MPC's alleged spoliation. Standex has not shown or even plausibly alleged that MPC acted in bad faith when it destroyed or failed to preserve the sensors and assemblies. *See Bracey v. Grondin*, 712 F.3d 1012, 1018 (7th Cir. 2013).

The remainder of Standex's argument (ECF No. 146-1 at 32-37) rests largely on the premise that the only way MPC can prove its claim that the sensors did not comply with the specifications is to test each sensor. This argument fails as a matter of law. A plaintiff may be able to prove its damages by extrapolating from tests of samples. *See, e.g., Residential Funding Co., LLC v. First Mortg. Corp.*, No. 13-cv-3490 (SRN/HB), 2018 U.S. Dist. LEXIS 215490, at *24-26 (D. Minn. Dec. 21, 2018). Or, as discussed below with respect to Standex's motions to exclude the Ford spreadsheets and to exclude Patrick O'Keefe, the Ford spreadsheets may constitute a sufficient basis for the finder of fact to conclude that the sensors failed.

## 3. Standex's Motion in Limine to Exclude the Ford Spreadsheets (ECF No. 135)

Standex moves in limine to exclude spreadsheets of sensor-related warranty claims. (ECF No. 135.) It argues that "[t]he Warranty Data Spreadsheets are—simply put—a collection of unverified hearsay statements of thousands of unidentified declarants" that MPC seeks to introduce to prove "that the sensors improperly caused a

Diagnostic Trouble Code ('DTC') and were removed and replaced." (ECF No. 135 at 4-5.) It argues that the spreadsheets do not fit within Fed. R. Evid. 803(6) because they were not created in the regular course of business but rather as part of Ford's efforts to resolve its warranty claims with MPC.

"The business-records exception removes the hearsay bar for records kept in the course of a regularly conducted business activity if making the records is a regular practice of that business activity, so long as 'neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.'" *Jordan v. Binns*, 712 F.3d 1123, 1135 (7th Cir. 2013) (quoting Fed. R. Evid. 803(6)). Courts "presume the reliability of business records based on the lack of deceitful incentive and the habitual accuracy implicit within regularity." *Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 956 (7th Cir. 2021).

MPC explains that the spreadsheets reflect data from Ford's Analytical Warranty System for thousands of sensor-related warranty claims. (ECF No. 158 at 4.) It contains 56 columns and nearly 71,000 lines of data. (ECF No. 135 at 2.) Dealerships input the raw repair data into the system to obtain reimbursement from Ford for warranty repairs. (ECF No. 158 at 3.) Ford then relies on the data to identify problems with suppliers. (ECF No. 158 at 3.)

The spreadsheets include columns for comments from the technician at the dealership and for comments from the customer. (ECF No. 135 at 3.) Thus, the statements

in these columns do not reflect statements by Ford employees. (ECF No. 135 at 4.) And Ford employees do not independently verify the veracity of the comments. (ECF No. 135 at 4.)

Standex initially argues that the spreadsheets could not come within the business records exception to the hearsay rule, *see* Fed. R. Evid. 803(6), because they were created in contemplation of litigation—specifically, as part of Ford's efforts to obtain reimbursement from MPC. "It is well established ... that documents prepared in anticipation of litigation are not admissible under FRE 803(6)." *Jordan*, 712 F.3d at 1135. "Litigation generally is not a regularly conducted business activity." *Id.*

While the spreadsheets might not have been in existence before litigation was contemplated, Standex views the issue too narrowly. The "records" are the data in Ford's Analytical Warranty System; the spreadsheets are merely a printout of that data. To say that the spreadsheets were not created until litigation was contemplated is akin to arguing that a digital document on a company's computers is not a business record because it was not printed or converted into a PDF until it was requested in discovery. The fact that the data was filtered and parsed to identify that which was relevant does not change the conclusion. This process was no different than what is routinely done to identify and disclose electronically stored information.

MPC has adequately demonstrated that the spreadsheets reflect data acquired and maintained by Ford as part of its Analytical Warranty System for its routine business

purpose of monitoring warranty claims. As such, the spreadsheets fall within Fed. R. Evid. 803(6).

However, that only addresses the first level of hearsay—that is, the spreadsheets themselves. It does not address any hearsay problem within the spreadsheets. Standex does not articulate what sort of material hearsay statements are included in the "Customer Comments" column (nor does MPC suggest that it may seek to rely on any such hearsay). But a witness explained that data from the "Technician Comments" column—specifically, references to the particular codes associated with problems with each sensor— were used to identify warranty claims related to the sensor. (ECF No. 135 at 4.) Thus, it appears that MPC relies on the technicians' comments to show that each sensor failed.

Standex and MPC dispute whether the dealership technicians were truly Ford "outsiders," *see Datamatic Servs. v. United States*, 909 F.2d 1029, 1033 (7th Cir. 1990); (ECF Nos. 135 at 8; 158 at 12), but the distinction is immaterial. Even if the technicians lacked a sufficient connection to Ford to render the statements Ford's business records, the statements were nonetheless business records, albeit of the dealerships. MPC has demonstrated that the Analytical Warranty System was how Ford dealerships got paid by Ford for warranty repairs. Performing warranty repairs and getting paid for doing so is undoubtedly a regularly conducted activity of a vehicle dealership.

Standex argues that the statements are unreliable because the dealerships were financially motivated to report problems in order to obtain compensation from Ford. (ECF No. 135 at 9.) But business records are routinely connected to financially beneficial transactions. If that connection were sufficient to demonstrate a lack of trustworthiness, it would gut the business records rule. Here, the court is presented with no reason to suspect that any technician falsely reported a diagnostic test code so the dealership could perform unnecessary warranty repairs. While it will remain MPC's obligation to lay a sufficient foundation for their admission at trial, Standex has not shown that the Ford spreadsheets are categorically subject to exclusion. Therefore, the court will deny Standex's motion in limine (ECF No. 135).

### 4. Spoliation

Standex asks the court to dismiss MPC's claims, or at least give an adverse inference jury instruction against MPC, because MPC did not require that Ford retain all of the allegedly defective products, nor did MPC retain all of the oil separator assemblies and sensors it received from Ford. (ECF No. 143.)

"In this circuit, when a party intentionally destroys evidence in bad faith, the judge may instruct the jury to infer the evidence contained incriminatory content." *Bracey*, 712 F.3d at 1018. "When considering the propriety of such an adverse inference instruction, '[t]he crucial element is not that the evidence was destroyed but rather the reason for the destruction.'" *Id.* at 1019 (quoting *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002)).

It is not enough for a movant to show that the adversary violated a duty to preserve evidence. *Id.* The movant must show that the evidence was destroyed in bad faith. *Id.* "A party destroys [evidence] in bad faith when it does so 'for the purpose of hiding adverse information.'" *Id.* (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008)).

Standex's argument fails at the first step—bad faith. It seems to acknowledge as much when it argues in reply, "Regardless of whether MPC destroyed the Sensors in bad faith, it did destroy the Sensors intentionally when it knew litigation was imminent. This is the very type of behavior sanctions are intended to address." (ECF No. 172 at 3.)

But as the court in *Bracey* made very clear, intentional destruction is not enough. 712 F.3d at 1019 (citing *Faas*, 532 F.3d at 645); *see also Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001) ("While Illinois Bell admits that the documents were destroyed intentionally, to draw an inference that the records favored Rummery requires us to conclude that the documents were destroyed in 'bad faith,' *i.e.*, that the document destruction was 'for the purpose of hiding adverse information.'") (quoting *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998)).

MPC explains that it did not preserve the assemblies because the "the oil separator component and the sensor have no functional interaction in operation …." (ECF No. 160-1 at 2.) Thus, "MPC discarded most of the oil separator components it received as a practical exercise, fully confident that they did not have any impact on the field performance of the Sensors themselves." (ECF No. 160-1 at 3.) Storing the "oily, messy,

big plastic parts" also was logistically difficult. (ECF No. 160-1 at 3.) Nonetheless, it preserved 30 of the assemblies and provided them to Standex.

As for the sensors, which are just a part of the overall assembly and thus much smaller, MPC retained and provided 250 of them to Standex. (ECF No. 160-1 at 3.) It does not explain why it did not retain more. But an explanation from MPC is unnecessary because Standex has not presented a reason to believe that MPC acted in bad faith. Therefore, the court must deny Standex's motion for sanctions (ECF No. 143).

**5. Experts**

"Any assessment of the admissibility of expert witness testimony begins with Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert*, as together they govern the admissibility of expert witness testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (quoting *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017)).

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
  (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
  (b)   the testimony is based on sufficient facts or data;
  (c)   the testimony is the product of reliable principles and methods; and
  (d)   the expert has reliably applied the principles and methods to the facts of the case.

Case 2:18-cv-01838-WED   Filed 11/17/21   Page 20 of 39   Document 177

"Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)). The court is the gatekeeper when it comes to expert testimony. *C.W. v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). However, "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion: the inquiry must 'focus…solely on principles and methodology, not on the conclusions they generate.'" *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (quoting *Daubert*, 509 U.S. at 595).

"[T]he district court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam*, 877 F.3d at 779 (emphasis in original).

> [C]ourts should evaluate the reliability of a qualified expert's testimony by considering, amongst other factors: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; … (4) whether the theory has been accepted in the relevant scientific community. …[;] (5) whether maintenance standards and controls exist; (6) whether the testimony relates to matters growing naturally and directly out of research they have conducted independent of the litigation, or developed expressly for purposes of testifying; (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (8) whether the expert has adequately accounted for obvious alternative explanations; (9) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and (10) whether the field of expertise claimed by the expert is

known to reach reliable results for the type of opinion the expert would give.

*Id.* (quoting *Krik*, 870 F.3d at 674 and *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534 (7th Cir. 2005)) (internal quotation marks and brackets omitted). "Importantly, this list is neither exhaustive nor mandatory." *Id.* at 780 (quoting *C.W.*, 807 F.3d at 835). "[T]here are many different kinds of experts, and many different kinds of expertise." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). Both Rule 702 and *Daubert* reflect a flexible standard where broad discretion is vested with the district court, although this flexibility is not without limit. *Krik*, 870 F.3d at 674, 680.

The court applies these standards to the parties' challenges to four experts, as discussed below.

### 5.1. Standex's Motion to Exclude Patrick O'Keefe

MPC retained Patrick O'Keefe, an accountant, to opine on the reasonableness of the settlement that MPC entered into with Ford. He reviewed the warranty claim spreadsheets to assess MPC's potential liability for past and future warranty claims. He largely accepted the data at face value. He did not confirm that the data had not been altered. He did not verify that the dealerships actually charged, or that Ford actually paid, the amounts reflected on the spreadsheet. (ECF No. 138-1 at 3.) Nor did he review any of Ford's audits of the dealerships' warranty repairs. (ECF No. 138-1 at 3.) In Standex's view, this lack of verification makes O'Keefe's opinions unreliable.

Courts "have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152. "Reliability, however, is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id.* (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 767 (7th Cir. 2013) (reversing because the court should have let the jury decide how uncertainty as to the data the expert relied on affected expert's opinion). "The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible." *Stollings*, 725 F.3d at 768. "[T]he selection of data inputs to employ in a model is a question separate from the reliability of the methodology reflected in the model itself." *Manpower*, 732 F.3d at 807.

Therefore, "an expert does not always have to investigate facts to determine what he believes to be the truth …." *Family Worship Ctr. Pentecostal Church of Holiness, Inc. v. See*, No. 09-C-0094, 2012 U.S. Dist. LEXIS 141417, at *7 (E.D. Wis. Sep. 30, 2012). If the assumption is not sustained by the evidence at trial, the finder of fact (which in this case will be the court) will disregard the expert's testimony. *Id.* Although the court will be the

finder of fact in this action, it nonetheless would be an abuse of discretion if the court at this stage were to "unduly scrutinize[] the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower*, 732 F.3d at 806; *see also Raab v. Wendel*, No. 16-CV-1396, 2017 U.S. Dist. LEXIS 217704, at *7 (E.D. Wis. Dec. 18, 2017) (quoting *La Playita Cicero, Inc. v. Town of Cicero*, No. 11-cv-1702, 2017 U.S. Dist. LEXIS 44868, at *10-11 (N.D. Ill. Mar. 28, 2017) ("The reliability of such factual assumptions … is to be tested by the adversarial process and determined by the jury." (brackets and quotation marks omitted))). Thus, for example, an accounting expert may appropriately rely on financial information provided by his client and the assumptions provided by counsel to project earnings. *Manpower*, 732 F.3d at 807 (discussing *Tuf Racing Products v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)).

MPC has adequately demonstrated that the Ford recall spreadsheets are the sort of data that experts in O'Keefe's field would reasonably rely on in forming an opinion. (ECF No. 161-1 at 12.) O'Keefe is qualified and his opinion will help the court, serving as the finder of fact, determine a fact in issue. His opinion is based on sufficient facts and data. MPC has adequately demonstrated that his opinions are the product of reliable principles and methods and that he reliably applies those principles and methods to the facts of the case. Standex is free to present evidence at trial to try to persuade the court that the data on the spreadsheets are unreliable. But Standex's speculation as to their unreliability (or O'Keefe's failure to independently verify the data) is not a basis to

exclude O'Keefe's opinion. Accordingly, Standex's motion (ECF No. 138-1) will be denied.

### 5.2. MPC's Motion to Exclude John G. Peters (ECF No. 121)

Standex retained John G. Peters to rebut O'Keefe's opinions. (ECF No. 141-12 at 10.) MPC asks the court to bar Peters from testifying because he has no experience with automotive warranty claims or the relevant methodologies O'Keefe employed. (ECF No. 128-1 at 2.) Rather, Peters identifies as an expert in business income claims and personal injury loss, neither of which are implicated in this case. (ECF No. 128-1 at 2.) MPC also argues that Peters inappropriately relied on a lost profits analysis and employed guesswork in reaching his conclusions. (ECF No. 128-1 at 2.)

Standex explains:

> The primary purpose of Mr. Peters' testimony is to highlight that Mr. O'Keefe did not exercise appropriate professional care in obtain [sic] sufficient underlying data regarding the Ford warranty claim costs (in the form of invoices, payment records, dealer cost controls, transmittal letters) and did not sufficiently audit or vet the data before relying on it in forming his conclusions.

(ECF No. 156-1 at 9.)

Peters need not possess precisely the same expertise as the expert whose opinions he aims to rebut. Thus, the court rejects MPC's argument that Peters lacked the knowledge, skill, experience, training, or education to testify as an expert on the matters relating to accounting simply because he did not have experience with vehicle recalls.

Having said that, for the most part Peters's report is not comprised of opinions founded in scientific, technical, or other specialized knowledge based on established reliable principles and methods reliably applied to the facts of the case. Rather, his report consists of the sorts of lay observations that anyone with an understanding of Excel could make, or an attentive attorney could point out on cross-examination of O'Keefe or in summation. *See Empire Med. Review Servs. v. CompuClaim, Inc.*, No. 13-CV-1283, 2018 U.S. Dist. LEXIS 228074, at *6-7 (E.D. Wis. Mar. 16, 2018). For example, Peters notes that the spreadsheets that O'Keefe relied on had some large repair charges and appeared to include some duplicative entries. But that is hardly a matter of expertise; it is self-evident from a fairly simple matter of searching, sorting, and scrutinizing the data. Pointing out that a spreadsheet contains certain data is not an opinion, much less an expert opinion.

Insofar as Peters offers any statement that could be characterized as an opinion (*see* ECF No. 141-12, ¶¶ 11, 15, 19, 22, D), many are classic impermissible *ipse dixit* ungrounded in any identified principle or method. "'Because I said so,' even from a person who seems qualified to say so, is not a reliable principle or method under Rule 702." *Empire Med. Review*, 2018 U.S. Dist. LEXIS 228074, at *11 (citing *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009); *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)). "[S]imply because he is an expert does not permit the court to admit his opinions when he failed to ground those opinions in reliable principles and methods." *Id.* at *10 (E.D.

26

Wis. Mar. 16, 2018) (citing *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 815 n.17 (N.D. Ill. 2005)).

It is not enough for Peters to note that O'Keefe did not do something. A layperson can note that. Rather, for Peters to be able to opine that O'Keefe *should* have done something, he must point to some established professional principle and explain why an expert in O'Keefe's position would have been expected to do what he failed to do.

The only instance the court has identified where Peters approached connecting his opinion with any accounting principle or methodology is when he stated his disagreement with O'Keefe over whether extra repair costs could be regarded as lost profits. (ECF No. 141-12, ¶ 22.) Peters's explanation is superficial; he simply says that "lost profits" can result from increased costs. (ECF No. 141-12, ¶ 22.)

As framed by Peters, this is hardly a matter of accounting expertise. If a business has increased costs but the same revenue, naturally its profits will be lower. But the issue is not that simple. The question is whether the methodology for fixing a present value of future lost profits is an appropriate means for assessing the present value of a claim for future warranty costs. Answering that question is a matter of accounting expertise, but Peters does not ground his answer in any sort of reliable principle or method. *See Empire Med. Review Servs.*, 2018 U.S. Dist. LEXIS 228074, at *10 (noting that "principles and methods of accounting and auditing are well-established and formalized" and, therefore, experts need not rely "upon an expert's amorphous experience").

In response to MPC's motion, Peters submitted a declaration wherein he states that his opinions are "based on and in accordance with the standards of the Wisconsin Administrative Code for Certified Public Accountants, Accy 1.201, and the guidelines of the American Institute of Certified Public Accountants." (ECF No. 157, ¶ 2.) But Peters still does not connect any opinion to any specific principle or method.

Finally, in its response Standex states that Peters explained his methodology in his deposition, citing pages 112 and 120 to 122 of Peters's deposition in support. (ECF No. 156-1 at 8-9.) But Standex did not include pages 120 to 122 in the portion of Peters's deposition provided to the court. (ECF No. 141-4.)

On page 112, Peters discusses the portion of his report where he said:

> If the MPC share of repair cost was $9.9m as suggested by Mr. O'Keefe table 7, and that amount were discounted to the ~date of injury (10/2014) under the "ex ante" method, and at a modest risk discount rate of 15%, the amount would be reduced to $6.4m. This approach would raise substantial doubt about whether the settlement reached by MPC was a good deal.

(ECF No. 141-12 at 10.) Following "15%" is a footnote that states, "The return and risk normally associated with small and mid-cap stocks and stock funds." (ECF No. 141-12 at 10.) At his deposition Peters was asked to explain how the risk of future repairs is comparable to the risk inherent in small or medium-capped stocks. (ECF No. 141-4 at 15, 111:25-112:1-2.) He responded:

> Owning a small-capped stock is not a sure thing. You could be going along like you might have been in late 2007 and be enjoying consistent returns and it could decline by 15 percent the next year, just as if you could be going along thinking that each repair was costing you $200 and then it declines to

$77. There's considerable volatility up and down with the stream of costs related to the – costs related to the repair and to the things that might impact a small company on the stock market. It's a high risk, but not the ultimate risk.

(ECF No. 141-4 at 15, 112:9-20.)

It appears that the 15 percent figure reflects a present-value discount rate, but it is unclear why Peters frames this discussion in terms of volatility (which suggests the prospect of both increasing and decreasing costs) or how the prospect of increasing or decreasing repair costs fits into the discount rate. Most importantly, Peters does not connect that 15 percent discount to any principle of accounting. Thus, while it may be appropriate to discount a present payment for a future liability by some rate to account for the productive use that the money could be put to before the liability comes due, Peters provides no explanation as to why that discount should be 15 percent (or even make clear that this is the reason for the 15 percent discount he applies).

In sum, while there is no dispute that Peters may be qualified to offer expert testimony on matters of accounting, the observations he offers in his report are generally not opinions, much less expert opinions within the scope of Rule 702. As to any statement he offers that may be properly regarded as an expert opinion, Standex has failed to show that those opinions were the product of reliable principles and methods and that Peters reliably applied those principles and methods to the facts of the case. Consequently, the court will grant MPC's motion to exclude Peters from testifying as a rebuttal expert. (ECF No. 121.)

### 5.3. Standex's Motion to Exclude Pradeep Lall (ECF No. 133)

MPC retained Pradeep Lall, a mechanical engineer, to determine why the sensors failed. (ECF No. 134-2 at 9, ¶ 5.) Standex argues that "Lall's report and opinions are based on unsupported assumptions and improper extrapolation." (ECF No. 133 at 1.) It makes two challenges to Lall's opinions.

First, it argues that Lall improperly assumed that any returned sensor that functioned properly when tested functioned only intermittently. (ECF No. 133 at 5-9.) Standex argues that Lall's assumption of intermittent failure is improper because he did not personally verify that the sensors ever failed. (ECF No. 133 at 5-6.) But Lall's assumption that the sensors failed was not without evidentiary basis. As discussed with respect to the opinions of Patrick O'Keefe, Ford's spreadsheets support the assumption that the sensors failed. Whether MPC will be able to prove that fact is a matter for trial.

*Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir. 1999), upon which Standex relies, is distinguishable. The court in *Clark* found an expert was not helpful to the finder of fact because the expert assumed the fact he was hired to determine—whether a seatbelt became disconnected during an accident. *Id.* at 757. Lall was not retained to determine *if* the sensors failed but rather *why* they failed. He was permitted to assume that the sensors failed and to leave it to MPC to prove that fact at trial. Lall's answer to the question of why the sensors failed is relevant and will be helpful to the finder of fact.

Standex's second challenge to Lall's opinion is that his testing is insufficient to support extrapolation to the entire population of sensors that allegedly failed. (ECF No. 133 at 9-11.) In Standex's calculation, Lall and MPC tested less than 0.08 percent of the allegedly defective sensors. (ECF No. 133 at 9.)

Standex points to *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir. 1975), where the court said that "statistical evidence derived from an extremely small universe, as in the present case, has little predictive value and must be disregarded." (ECF No. 133 at 10, 11 (quoting *Harper*, 525 F.2d at 412).) But the issue in *Harper* is wholly inapposite; it involved not the propriety of an expert opinion but rather whether an airline's policy of barring any employee from marrying another employee violated Title VII. The plaintiff pointed to evidence that, of the five married couples that had been subjected to the policy, in four of the couples it was the wife who gave up her job. *Harper*, 525 F.2d at 412. The court of appeals found that the trial court, which was sitting as the finder of fact in a non-jury trial, properly concluded that the statistical evidence was unpersuasive and did not show that the policy constituted sex discrimination. *Id.*

Standex also points to the court's analysis in *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-md-2359, 2018 U.S. Dist. LEXIS 90, at *26-29 (D. Minn. Jan. 2, 2018), in which the expert opined that all or most of the siding manufactured by the defendant was defective. *Id.* at *26. In effect, the expert was attempting to calculate the failure rate of the

siding. He tested 11 samples, five of which were new siding and six of which came from structures already experiencing problems.

The court concluded that the sample of new siding was too small to be predictive and was chosen without any identified sampling technique to ensure it was representative. The remaining samples were not representative of all of the defendant's siding because they were cherry-picked from structures already experiencing problems.

The samples that Lall and MPC tested were likewise cherry-picked from a population already identified as defective, *i.e.*, sensors that were replaced after triggering a diagnostic trouble code. But Lall was answering a very different question than the expert in *Hardieplank.* Rather than try to identify how many of Standex's sensors failed, Lall attempted to identify why the sensors failed. It would seem logical that Lall would attempt to answer that question by reviewing the sensors that allegedly failed.

Of course, questions of causation likewise may require a sufficient sample size. For example, an expert probably could not test one sensor, identify why it failed, and opine that thousands of other sensors failed for the same reason. But the flaw in such a conclusion is not necessarily the sample size but more broadly the failure to account for alternative explanations. If there was only one plausible explanation for an outcome, a test of a single sample (or none) may be sufficient.

That was the problem in *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771 (7th Cir. 2017), another case on which Standex relies. After concluding that the district court

properly excluded the expert's opinion that an explosion in a laptop battery caused a housefire (as opposed to the prospect that the fire caused the explosion), the court went on to note that the expert failed to support his opinion that a manufacturing defect caused the laptop battery to explode. The expert did not assess the defendant's manufacturing methods and "could not provide details as to *what* the specific defect was; *why* it transpired; *when* it occurred in the manufacturing process; or even *where* such manufacturing took place." *Id.* at 787 (emphasis in original). He simply opined that, because a manufacturing defect can cause a problem that would lead to a battery exploding, it must have occurred here. *Id.* at 787-88.

Lall did consider alternative explanations. In fact, it is his consideration of explanations that were not experimentally confirmed that forms a basis for Standex's challenge to his opinions. Lall tested and verified his hypotheses to the extent he found appropriate under the circumstances. The absence of experimental confirmation was itself probative in that it suggested intermittent functioning of the sensors. His testing is subject to repetition and verification. Overall, MPC has demonstrated that there is a sufficiently reliable basis for Lall's opinions, that Lall is qualified to offer those opinions, and the opinions would be relevant to the issues in this action. Consequently, Standex's motion to bar Lall from testifying (ECF No. 133) will be denied.

**5.4. MPC's Motion to Exclude Michael Nranian (ECF No. 129)**

Standex retained Michael Nranian, a professional engineer, to offer his opinions about the sensors and Lall's opinion. (ECF No. 155-5 at 3, ¶ 1.) There is no dispute that Nranian is qualified to testify as an expert. Rather, MPC challenges a narrow aspect of Nranian's opinion regarding the temperatures the sensors were exposed to and the possible effect of those temperatures.

According to Nranian's report,[2] Ford and MPC specified that the sensors must be able to operate at temperatures up to 125° C. (ECF No. 155-5 at 31, ¶ 98.) Nranian measured the temperature of the sensor on two Ford vehicles and found that, during the "diesel particulate filter regeneration process," a pollution control process that occurs automatically every 100 to 500 miles and lasts for nine to twenty minutes (ECF No. 141-10 at 2, ¶ 72), the temperature of the sensors ranged between 131° and 160° C (ECF No. 155-5 at 16, ¶ 81; 23, ¶ 82). Based on this, Nranian opined that Ford and MPC should have specified that the sensors be able to function in temperatures of up to 160° C. (ECF No. 155-5 at 27, ¶ 86.)

Nranian offered three overlapping opinions regarding the possible effect of high temperatures:

---

[2] Neither party submitted Nranian's full report. Rather, each side submitted excerpts (some portions multiple times), which has deprived the court of some of the helpful context of Nranian's statements and forced the court to cobble together four separate filings (ECF Nos. 141-10; 147-104; 153-2; 155-5) to get a sense of Nranian's work.

- Exposure to high temperatures "provides a strong explanation for at least the alleged 'intermittent behavior' and alleged 'intermittent non-conformities' of the Standex Sensors that could not be reproduced under the specified temperature ranges, and perhaps for all of the alleged failures." (ECF No. 155-5 at 28, ¶ 87.)

- "Exposure to vehicle operating temperatures above the [maximum] temperature that was specified can cause intermittent sensor electrical outputs that are outside of the standard. When the sensor environment is returned back to the environmental parameters as-specified in the Ford CCV Sensor Engineering Specification, then the alleged 'intermittent behavior' and alleged 'intermittent fault' and alleged 'intermittent non-conformities' discontinue (e.g. the circuit is not out of balance)." (ECF No. 155 at 29, ¶ 88.)

- "However, as the CCV Sensor continues to be exposed to harsh environmental conditions and temperatures above what was specified, required, agreed-to, and mandated to Standex by Ford and MPC, the CCV Sensor (or any of the individual electrical/electronic components of the sensor) may degrade and eventually not function properly, or even fail. This type of behavior is also true for any type of electronic/electrical component." (ECF No. 155-5 at 29, ¶ 89.)

But Nranian made clear at his deposition that he was not actually offering an opinion that exposure to temperatures higher than those indicated in the specifications is what caused the sensors to allegedly fail. (ECF No. 130-1 at 5.) It was his opinion only that it was possible that the heat caused the failure.

In MPC's view, Nranian's speculation that excessive temperatures could have caused the failure of the sensors is not good enough. None of the sensors failed when Nranian tested them under higher than specified temperatures. Standex responds that

Nranian's opinion is still helpful to the finder of fact even if he did not identify the cause of the failure. (ECF No. 154 at 2.)

An expert is "not required to have an opinion on [an] ultimate question to be permitted to testify." *Walker v. Soo Line R.R.*, 208 F.3d 581, 587 (7th Cir. 2000). But an expert cannot speculate. *DePaepe v. GMC*, 141 F.3d 715, 720 (7th Cir. 1998); *Target Mkt. Publ'g v. ADVO, Inc.*, 136 F.3d 1139, 1143 (7th Cir. 1998) (quoting *GE v. Joiner*, 522 U.S. 136, 140 (1997)). If an expert offers hypothetical alternative theories of a case, those alternatives must have "analytically sound bases." *Smith*, 215 F.3d at 719 (quoting *DePaepe*, 141 F.3d at 720).

Nranian has provided an appropriate basis for his conclusion that the sensors were subject to higher heat than specified. And, as with Lall, the fact that he did not experimentally confirm the intermittent failure does not mean that it was not supported. But Nranian still must point to a basis for his conclusion that subjecting the sensors to higher heat than specified could cause them to fail. *See Thakore v. Universal Mach. Co. of Pottstown*, 670 F. Supp. 2d 705, 730 (N.D. Ill. 2009) ("Of course, expert opinion must have an analytically sound basis so that it is not speculation in disguise.").

Nranian provides scant support for that conclusion. He states, "For example, in general, electrical resistance in conductors generally increases with heat, while electrical resistance in semi-conductors generally decreases with heat, and depending on the type of resistor used, electrical resistance of resistors also vary with heat (resistance in

insulators generally decrease with heat)." (ECF No. 155-5 at 28, ¶ 88.) And he notes evidence that Standex designed the sensor in consideration of the specified maximum temperature. (ECF No. 155-5 at 28-29, ¶ 88.) This explanation does not seem to connect these general observations to the specific sensor at issue.

Nranian does not state, for example, how the sensor would have been designed or manufactured differently had the specifications identified that the maximum temperature was 160° C, as Nranian opines they should have. In other words, notwithstanding the fact the specifications identified the maximum temperature as 125° C, Nranian has not shown that the sensors could not withstand maximum temperatures of up to 160° C. Nranian seems to presume that the sensors could not withstand a temperature higher than that specified, and he speculates that a higher than specified temperature could cause the sort of intermittent failures reported. Speculation, ungrounded in any reliable principle or method, is insufficient under Rule 702. *See Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019) ("To satisfy the requirements of Rule 702 and *Daubert*, Woerhle needed to show that his conclusions were the fruit of a rigorous, objectively-verifiable approach—something more than mere speculation."); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("Rule 702 does require, however, that the expert explain the 'methodologies and principles that support his opinion; he cannot simply assert a 'bottom line.'").

Case 2:18-cv-01838-WED   Filed 11/17/21   Page 37 of 39   Document 177

However, as MPC notes in its response to Standex's motion to bar Lall from testifying, although the strictures of Rule 702 and *Daubert* continue to apply, the court has more flexibility when the issue is the admission of expert testimony at a bench trial. (ECF No. 159-1 at 10-11.) With the judge as the finder of fact, there is not the concern that the jury will be misled by testimony inappropriately admitted under the label of "expert." *See Metavante Corp.*, 619 F.3d at 760. At a bench trial the court can admit marginal expert testimony and, if it does not pass muster, exclude it later. *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.").

Given that the parties have not provided the court with Nrainian's entire report, the court is deprived of the entire context in which he offers his opinions. Although the reliability of Nrainian's opinions seems marginal, the court will err on the side of permitting him to testify and deny MPC's motion (ECF No. 129). If all Nranian can offer is ungrounded speculation, not only will his opinion prove unpersuasive, but the court will strike his testimony at trial.

## 6. Conclusion

For the reasons set forth above,

**IT IS THEREFORE ORDERED** that the parties' motions to restrict documents (ECF Nos. 122, 150, 165, 170) are **granted**.

**IT IS FURTHER ORDERED** that Miniature Precision Components Inc.'s Motion for Partial Summary Judgment as to Liability (ECF No. 131) is **denied**.

**IT IS FURTHER ORDERED** that Standex Electronics Inc.'s motion for summary judgment (ECF No. 145) is **granted in part** as set forth in this order. Count Six of the complaint is **dismissed**.

**IT IS FURTHER ORDERED** that Miniature Precision Components Inc.'s motion in limine to exclude the testimony of John G. Peters (ECF No. 121) is **granted**.

**IT IS FURTHER ORDERED** that Miniature Precision Components Inc.'s motion to exclude certain testimony of Michael Nranian (ECF No. 129) is **denied**.

**IT IS FURTHER ORDERED** that Standex Electronics Inc.'s motion in limine to exclude the testimony of Pradeep Lall (ECF No. 133) is **denied**.

**IT IS FURTHER ORDERED** that Standex Electronics Inc.'s motion to exclude the Ford warranty spreadsheets (ECF No. 135) is **denied**.

**IT IS FURTHER ORDERED** that Standex Electronics Inc.'s motion to exclude the testimony of Patrick O'Keefe (ECF No. 138) is **denied**.

**IT IS FURTHER ORDERED** that Standex Electronics Inc.'s motion for sanctions for spoliation (ECF No. 143) is **denied**.

Dated at Milwaukee, Wisconsin this 17th day of November, 2021.

William E. Duffin

WILLIAM E. DUFFIN
U.S. Magistrate Judge